**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL ACTION NO. 3:21-CV-00333-RJC-DSC**

| | | |
|---|---|---|
| **JESUS GUERRERO, MAUREEN YOUNG, RACHELLE BLAKE AND RHONDA MCDONALD ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,** **,** | ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) )) | **MEMORANDUM AND RECOMMENDATION** |
| **v.** | ) ) | |
| **BANK OF AMERICA N.A.** | ) ) ) | |
| **Defendant.** | ) | |

---

### MEMORANDUM AND RECOMMENDATION

**THIS MATTER** is before the Court on Defendant Bank of America N.A.'s Motion to Dismiss the First Amended Complaint or, in the Alternative, Stay (Doc. 31), Defendant's Motion to Strike Unjust Enrichment Class Allegations (Doc. 32), and the parties' briefs and exhibits.

This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and the Motion is now ripe for the Court's consideration.

Having fully considered the arguments, the record, and the applicable authority, the undersigned respectfully recommends that Defendant's Motion to Dismiss be <u>granted</u> in part and <u>denied</u> in part as discussed below. The undersigned further recommends Defendant's Motion to Strike be <u>denied</u> as moot.

1

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This putative class action is one in a series of cases arising from foreign transactions conducted by Plaintiffs Jesus Guerrero, Maureen Young, Rachelle Blake, and Rhonda McDonald using payment cards issued by Defendant Bank of America N.A. All allegations in the First Amended Complaint are accepted as true.

Defendant is a global financial institution that issues various types of payment cards to individuals. To facilitate payments conducted with these cards, Defendant contracts with Visa, Inc., Visa U.S.A. Inc., and Visa International Service Association (collectively "Visa") and Mastercard Incorporated and Mastercard International Incorporated (collectively "Mastercard"). Visa and Mastercard maintain electronic payment networks through which they process and transmit information pertaining to each transaction initiated by a cardholder. When a cardholder initiates a transaction for goods or services denominated in a foreign currency, Visa or Mastercard convert the cardholder's U.S. Dollars to the foreign currency and apply a foreign currency conversion rate ("FX conversion rate") that is a percentage of the payment sum. Visa and Mastercard's services regarding Defendant-issued cards are governed by separate written agreements between the two companies and Defendant (the "Processor Rules").

When Defendant issues a card to a cardholder, it does so pursuant to various written agreements. Prepaid cards are governed by a Commercial Prepaid Card Agreement ("Prepaid Credit Agreement"). Credit cards are governed by a credit card agreement ("Credit Card Agreement"). The parties agree debit cards are at a minimum governed by a debit card brochure ("Debit Card Brochure"). Defendant asserts that debit cards are also governed by a deposit agreement signed by each account holder ("Deposit Agreement"). Cardholders are issued a card branded either by Visa or Mastercard, which processor facilitates transactions made with that card.

There is no substantial difference in the relevant language in the agreements governing a Visa-branded card and a Master-card branded card of the same type, i.e., a Visa-branded credit card and a Mastercard-branded credit card. Moreover, the relevant language in each agreement remained substantially unchanged through all time periods covered by the First Amended Complaint.

Each agreement contained language governing the use of Defendant-issued cards to conduct transactions for goods or services denominated in foreign currency. Plaintiffs quote language from the agreements as examples, but do not attach any of them as exhibits to the First Amended Complaint.[1] With its Motion to Dismiss, Defendant attaches copies of a Credit Card Agreement (Doc. 31-5), Debit Card Brochure (Doc. 31-6), Deposit Agreement (Doc. 31-7), and Prepaid Card Agreement (Doc. 31-8). The agreement language supplied by Plaintiffs and Defendant varies slightly. For example, the First Amended Complaint quotes a Credit Card Agreement dated May 31, 2016 as follows:

> If you make a transaction in a foreign currency (including, for example, online purchases from foreign merchants), the transaction will be converted by Visa International or MasterCard International, depending on which card is associated with this account, into a U.S. dollar amount in accordance with the operating regulations or conversion procedures in effect at the time the transaction is processed. *Currently, those regulations and procedures provide that the currency conversion rate to be used is either (1) a wholesale market rate or (2) a government-mandated rate in effect one day prior to the processing date. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or posting date.*

Doc. 29, ¶ 54 (emphasis in original).

The corresponding paragraph in the sample Credit Card Agreement dated December 31, 2021 provided by Defendant reads:

---

[1] Plaintiffs do attach copies of the Processor Rules as Exhibit A (Visa) and Exhibit B (Mastercard). Doc. 29.

> If a transaction is made in a foreign currency, the transaction will be converted by Visa International or Mastercard International . . . into a U.S. dollar amount in accordance with the operating regulations or conversion procedures in effect at the time the transaction is processed. The currency conversion rate used by Visa is either (a) a rate selected by Visa from the range of rates available in wholesale currency markets for the applicable processing date, which rate may vary from the rate Visa receives; or (b) the rate mandated by a government or governing body in effect for the applicable processing date.

Doc. 31-5 at 2.

The named Plaintiffs were issued Visa-branded credit and debit cards by Defendant pursuant to the relevant agreements.[2] Members of the putative class were issued similar cards, Mastercard-branded credit and debit cards, and prepaid cards pursuant to relevant agreements. From December 2017 to October 2019, Plaintiffs used their cards to make numerous purchases denominated in foreign currencies. In some of these transactions, Visa applied an FX conversion rate that exceeded the range of wholesale market rates, or the rates paid by participants in the wholesale currency exchange market on the date when the transaction was processed. To others, Visa applied an FX conversion rate calculated by selecting bid and ask rates that occurred in different transactions but did not occur together in the wholesale market on the given date. The resulting FX conversion rates fell within the mathematical range of wholesale market rates on that date but did not correspond to any actual rate paid by a market participant. Visa also selected and applied FX conversion rates that did not correspond to the actual rates either Visa or Defendant paid in obtaining currencies necessary to effectuate Plaintiffs' transactions, and which were not proportional to the risks or costs borne by Visa or Defendant in effectuating these transactions. Visa and Mastercard selected rates similarly to transactions made by members of the putative class

---

[2] Plaintiffs do not supply the date on which they were issued their cards or the date of the agreement pursuant to which the cards were issued.

using various payment cards issued by Defendant. Defendant ratified each of these rates, charged them to Plaintiffs' and class members' accounts in billing statements, and collected payments thereon.

Plaintiffs commenced this action in this Court on July 9, 2021. Doc. 1. They amended their Complaint on December 20, 2021. Doc. 29. They bring claims for breach of contract (Count I), unjust enrichment (Count II), and breach of the implied covenant of good faith and fair dealing (Count III), as well as statutory claims under the North Carolina Unfair and Deceptive Trade Practices Act (Count IV), the California Unfair Competition Law (Count V), and the Texas Deceptive Trade Practices Act (Count VI). Defendant moved to dismiss the Complaint in its entirety on April 4, 2022. Doc. 31. Defendant simultaneously moved in the alternative to strike Plaintiffs' unjust enrichment claims from the nationwide class action. Doc. 32.

## STANDARD OF REVIEW

### I.     Rule 12(b)(1)

"A court does not have subject matter jurisdiction over an individual who does not have standing." Ansley v. Warren, No. 1:16-cv-00054-MOC-DLH, 2016 WL 5213937, at *9 (W.D.N.C. Sept. 6, 2016) (internal quotations omitted) (quoting AtlantiGas Corp. v. Columbia Gas Transmission Corp., 210 Fed. Appx. 244, 247 (4th Cir. 2006). A claim must be dismissed if the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The presence of subject-matter jurisdiction is a threshold issue the court must determine before considering the merits of a case. Jones v. Am. Postal Workers Union, 192 F.3d 417, 422 (4th Cir. 1999). Plaintiff has the burden of proving that subject-matter jurisdiction exists. Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). The district court should grant the Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id.

5

## II.     Rule 12(b)(6)

In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563. A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In Iqbal, the Supreme Court articulated a two-step process for determining whether a complaint meets this plausibility standard. First, the court identifies allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555) (allegation that government officials adopted challenged policy "because of" its adverse effects on protected group was conclusory and not assumed to be true). Although the pleading requirements stated in "Rule 8 [of the Federal Rules of Civil Procedure] mark[] a notable and generous departure from the hyper technical, code pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678-79.

Second, to the extent there are well pleaded factual allegations, the court should assume their truth and then determine whether they plausibly give rise to an entitlement to relief. Id. at

679. "Determining whether a complaint contains sufficient facts to state a plausible claim for relief "will ... be a context specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. "Where the well pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'show[n]' 'that the pleader is entitled to relief,'" and therefore should be dismissed. Id. (quoting Fed. R. Civ. P. 8(a)(2)).

The sufficiency of the factual allegations aside, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." Sons of Confederate Veterans v. City of Lexington, 722 F.3d 224, 228 (4th Cir. 2013) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)). Indeed, where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed." Neitzke v. Williams, 490 U.S. at 328; see also Stratton v. Mecklenburg Cnty. Dept. of Soc. Servs., 521 Fed. Appx. 278, 293 (4th Cir. 2013)). The court must not "accept as true a legal conclusion couched as a factual allegation." Anand v. Ocwen Loan Servicing, LLC, 754 F.3d 195, 198 (4th Cir. 2014).

## DISCUSSION

I.     **Defendant's Rule 12(b)(1) Motion to Dismiss the Claims Related to Mastercard-Branded Cards and Prepaid Cards for Lack of Standing Should Be Denied.**

A plaintiff must demonstrate they have standing to bring a claim. In order to demonstrate standing, a plaintiff must show (1) he has suffered an "injury in fact," (2) a causal connection between the injury complained of and the challenged action, and (3) that the injury can be redressed by a favorable decision. See Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc., 528 U.S. 167, 704, 120 S. Ct. 693, 145 L.Ed.2d 610 (2000) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992)). An "injury in fact" must be concrete and

particularized and actual or imminent, rather than conjectural or hypothetical. Lujan, 504 U.S. at 560, 112 S. Ct. 2130.

Defendant argues that Plaintiffs, who were all issued Visa-branded credit or debit cards, have no standing to bring claims regarding Mastercard-branded cards or prepaid cards. Courts have split on whether class representatives may seek to litigate harms similar but not precisely analogous to theirs but which were suffered by other class members. See Williams v. Potomac Fam. Dining Grp. Operating Co., No. GJH-19-1780, 2019 WL 5309628, at *4 (D. Md. Oct. 21, 2019). The Fourth Circuit has not weighed in on this issue. However, district courts in the circuit widely follow the "class certification" approach, which requires a named plaintiff to demonstrate only that they have individual standing to bring a claim and leaves further questions for a Rule 23 motion for class certification. Plaintiffs allege they have suffered injury in fact in each Count, caused by the conduct alleged in each Count and redressable by the requested relief. They have established individual standing to bring each claim.

Plaintiffs cite a bevy of caselaw on this point. Doc. 34 at 7. Defendant's authorities are distinguishable. In Lewis v. Casey, the Court upheld dismissal of claims involving substantively different conduct than that which injured the plaintiffs. 518 U.S. 343, 358 (1996). In Simon v. E. Ky. Welfare Rights Org., claims brought by organizations who did not and could not allege they suffered direct injury were dismissed. 426 U.S. 26, 40 (1976). Defendant does not address Plaintiffs' cases or the Fourth Circuit's adherence to the "class certification" approach. Defendant does not contend that Plaintiffs lack standing to bring any of the claims at least as to Visa-branded cards.

For those reasons, the undersigned respectfully recommends that Defendant's Motion to Dismiss pursuant to Rule 12(b)(1) be denied.

8

## II.  Defendant's Rule 12(b)(6) Motion to Dismiss Should Be Granted in Part and Denied in Part.

1.  Defendant's Motion to Dismiss Count 1 for Breach of Contract Should Be Denied.

"The elements of a claim for breach of contract are (1) the existence of a valid contract and (2) breach of the terms of that contract." Supplee v. Miller-Motte Bus. Coll., Inc., 768 S.E.2d 582, 590 (N.C. Ct. App. 2015).

i.  *Credit cards*

The sample Credit Card Agreement that governs the relationship between Defendant and cardholders such as Plaintiffs reads in pertinent part:

> **The currency conversion rate used by Visa is either (a) a rate selected by Visa from the range of rates available in wholesale currency markets for the applicable processing date, which rate may vary from the rate Visa receives**; or (b) the rate mandated by a government or governing body in effect for the applicable processing date.

Doc. 26-6 at 6 (emphasis added). Read plainly, this paragraph contains a promise by Defendant to counterparties that the conversion rates applied to foreign transactions will comport with the parameters of (a) or (b). It is irrelevant that Visa (or Mastercard) ultimately calculates and applies the rate to the transaction. Defendant undertook the contractual obligation to ensure the rates would meet these standards. That obligation is enforceable against Defendant.

Plaintiff relies principally on Speedway Motorsports Int'l Ltd. v. Bronwen Energy Trading, Ltd., 707 S.E.2d 385 (N.C. Ct. App. 2011). In that case, the court held that references in contracts governing letters of credit to separate agreements governing an underlying business transaction did not incorporate the terms of the latter and make them terms of the former. But the court gave two distinguishing reasons in reaching that decision: (1) the contracts at issue expressly referred to the agreements governing the underlying business transactions as "**separate agreements**," and

(2) there is a strong legal presumption (the "independence principle") that contracts governing each stage of the letter of credit transaction are separate and self-contained. Id. at 392. Neither of these reasons transfers neatly to this case. And in any event, the express language of the Credit Card Agreement itself creates the enforceable promise by Defendant, not any incorporation of the Processor Rules' terms into the Credit Card Agreement.

For these reasons, the undersigned respectfully recommends Defendant's Motion to Dismiss Count I be <u>denied</u> with respect to Plaintiffs' use of Defendant-issued credit cards.

ii.    *Debit cards*

The parties agree that the Debit Card Brochure governs, at least in part, the relationship between Defendant and cardholders issued Visa and Mastercard-branded debit cards. That Debit Card Brochure contains language substantially similar to the language from the Credit Card Agreement quoted above.

Defendant contends that language in the Debit Card Brochure stating that it is "part of" the Deposit Agreement incorporates the terms of the Deposit Agreement into the Brochure. It then argues that language in the Deposit Agreement disclaiming Defendant's liability for foreign exchange rates forecloses Plaintiffs' breach of contract claims with respect to their use of Defendant-issued debit cards. Doc. 31-7 at 46. But this language occurs in the context of a section in the Deposit Agreement governing transactions for which Defendant itself "determine[s] that it is appropriate to convert the transaction from one currency to another currency." Id. at 45. As examples of this type of transaction, the Deposit Agreement offers wire transfers in a foreign currency, bank notes, and checks, but conspicuously fails to mention debit card transactions. Id. at 45-46. Under this section of the Deposit Agreement, Defendant may determine "in [its] discretion" what rate to apply based on factors it considers "relevant." Id. at 46. This process does not comport with Defendant's version of the currency conversion process with respect to debit card

transactions, which it stresses is carried out by Visa or Mastercard with no direct involvement by Defendant.

Rather, the Deposit Agreement elsewhere notes that "separate agreements" govern the terms of use of debit cards. Those separate agreements, or the Debit Card Brochures, contain the same language as the Credit Card Agreements in which Defendant promises the FX conversion rates applied to transactions conducted with the card will be within the range of wholesale market rates observed on the relevant dates. This language governs the conduct at issue.

For these reasons, the undersigned respectfully recommends Defendant's Motion to Dismiss Count I be <u>denied</u> with respect to Plaintiffs' use of Defendant-issued debit cards.

   *iii.* *Prepaid cards*

Prepaid cards are governed by the Prepaid Card Agreement. Doc. 31-8. That Agreement contains language identical to the Credit Card Agreement with identical promises by Defendant. Doc. 31-8 at 5. For this reason, the undersigned respectfully recommends Defendant's Motion to Dismiss Count I be <u>denied</u> with respect to Plaintiffs' use of Defendant-issued prepaid cards.

## III. Defendant's Motion to Dismiss Count II for Unjust Enrichment Should Be Granted.

A party may claim unjust enrichment when it has conferred a benefit upon another party absent an express or enforceable contract between the parties. <u>Niloy, Inc. v. Lowe's Cos., Inc.</u>, No. 5:16-CV-00029-RLV-DCK, 2017 WL 29338, at *8 (W.D.N.C. Jan. 3, 2017). That claim is a quasi-contractual claim not based on a promise but rather "imposed by law to prevent an unjust enrichment." <u>Krawiec v. Manly</u>, 811 S.E.2d 542, 552 (2018) (citing <u>Booe v. Shadrick</u>, 369 S.E.2d 554, 556 (1988)). "If there is a contract between the parties the contract governs the claim and the law will not imply a contract." <u>MedShift, LLC v. Charles W. Morgan Pelle, LLC</u>, No. 3:20-cv-00434-RJC-DSC, 2022 WL 392507, at *10 (W.D.N.C. Feb. 8, 2022) (quoting <u>Booe</u>, 369 S.E.2d at 556).

Under Federal Rule of Civil Procedure 8(d)(2), plaintiffs are entitled to plead alternative or inconsistent claims. Plaintiffs argue their unjust enrichment claim should survive Defendant's Motion to Dismiss at the pleading stage in the event no enforceable contract is found to govern the parties' relationship. But the existence of such a contract is not in dispute. The Cardholder Agreements encompass the conduct alleged to have given rise to the unjust enrichment claim, namely the selection and application of currency conversion rates to foreign-currency transactions made with Defendant-issued payment cards. Plaintiffs are incorrect that Defendant "is contesting the enforceability of the alleged contract with respect to FX rates." Doc. 34 at 14. In its briefs, Defendant accepts the existence and enforceability of the Cardholder Agreements. See, e.g., Doc. 31-1 at Doc. 36 at 11, n.10. Rather, Defendant contests the nature of the promises it made in those Agreements and whether its conduct constituted a breach.

Plaintiffs' authorities do not support their position. In McPike v. Zero-Gravity Holdings, Inc, the court dismissed the plaintiff's unjust enrichment claim because "neither party here challenges the validity or enforceability of the Agreement between plaintiff and [defendant.]" 280 F. Supp. 3d 800, 810 (E.D. Va. 2017). In Renfinity, Inc. v. Jones, the court permitted the plaintiff to plead an unjust enrichment claim in the alternative when the issue of the existence and enforceability of the contract governing the conduct in question had not been settled. No. 20-422-KDB-DSC, 2022 WL 1102473, at *3 (W.D.N.C. Apr. 13, 2022). That issue has been settled here and provides no basis for an unjust enrichment claim.

For these reasons, the undersigned respectfully recommends Defendant's Motion to Dismiss be granted with respect to Count II. The undersigned further recommends Defendant's Motion to Strike Unjust Enrichment Class Allegations (Doc. 32) be denied as moot.

## IV. Defendant's Motion to Dismiss Count III for Breach of the Implied Covenant of Good Faith and Fair Dealing Should Be Granted.

Under North Carolina law, "it is well settled that a party to any agreement 'is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement.'" Red Apple Dev., LLC v. Rufus Road Partners, LLC, No. 3:19-cv-00157-GCM-DCK, 2022 WL 567844, at *4 (W.D.N.C. Feb. 24, 2022) (quoting Maglione v. Aegis Fam. Health Ctrs., 607 S.E.2d 286, 291 (N.C. Ct. App. 2005). However, an express contract precludes an implied contract with reference to the same matter. Dillon v. Leazer Grp., Inc., 374 F. Supp. 3d 547, 556 (E.D.N.C. 2019) (citing Vetco Concrete Co. v. Troy Lumber Co., 124 S.E.2d 905 (N.C. 1962)).

Apart from the alleged selection of rates exceeding the range of wholesale market rates which Plaintiffs argue constituted a breach of the contract, they argue Defendant's application of rates *within* that range to certain transactions violated the implied covenant of good faith and fair dealing. Specifically, Plaintiffs argue Defendant violated the implied covenant by applying: (1) rates at extreme ends of daily bid-ask pairs on the wholesale FX market resulting in fictional rates which bore zero resemblance to the bid-ask spread actually experienced by participants in the FX wholesale market; (2) rates that bore no resemblance to FX rates actually paid by Defendant or the processors; and (3) rates that bore no resemblance to the risk or costs assumed by Defendant and the Processors in settling the foreign transactions. Doc. 34 at 16.

As discussed above, Defendant's obligations regarding the application of FX rates to Plaintiffs' foreign transactions are governed by an express term of the contract—Defendant's promise that such rates will fall within the range of wholesale market rates for the relevant processing date or the government-mandated rate if applicable. By arguing that application of rates within that range violate the implied covenant of good faith and fair dealing, Plaintiffs essentially ask the Court to rewrite the terms of the contract and impose additional obligations on Defendant.

See James v. Vanderbilt Mortg. and Fin., Inc., No. 11CV498–MOC–DSC, 2012 WL 441170, at *4 (W.D.N.C. Jan. 23, 2012); VRX USA, LLC v. VRX Ventures, Ltd., No. 3:20CV409-GCM, 2020 WL 7229672, at *6 (W.D.N.C. Dec. 8, 2020). The law does not empower the Court to do so.

For these reasons, the undersigned respectfully recommends Defendant's Motion to Dismiss be granted with respect to Count III.

## V. Defendant's Motion to Dismiss Count 4 Under the NCUDTPA Should Be Granted.

To state a claim under N.C. Gen. Stat. § 75-1, *et seq.* (the "NCUDTPA"), a plaintiff must allege: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." CS Tech., Inc. v. Horizon River Tech., LLC, No. 3:19-cv-00157-GCM-DCK, 2020 WL 4546436, at *9 (W.D.N.C. Aug. 6, 2020) (quoting Walker v. Fleetwood Homes of N.C., Inc., 653 S.E.2d 393, 399 (N.C. 2007)). A plaintiff must: "(1) make the [NC]UDTPA claim separate and apart from a breach of contract claim, or (2) make the [NC]UDPTA claim based upon a breach of contract accompanied by '[s]ubstantial aggravating circumstances.'" Rezapour v Earthlog Equity Grp., Inc., No. 12-105-RLV, 2013 WL 3326026, at *5 (W.D.N.C. July 1, 2013) (quoting Suntrust Bank v. Bryant/Stutphin Props., 732 S.E.2d 594, 599 (N.C. Ct. App 2012)). A mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under the UDTPA. Davis v. State Farm Life Ins. Co., 163 F. Supp. 3d 299, 307-08 (E.D.N.C. 2016).

To control awards of damages under the NCUDTPA, "North Carolina courts have repeatedly held that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [section 75-1.1]." CS Technology, Inc., 2020 WL 4546436, at *9 (quoting Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998)). "North Carolina courts are extremely hesitant to allow plaintiffs to attempt to manufacture a tort action and alleged [unfair or deceptive acts or practices] out of facts that are properly alleged as

breach of contract." Id. (quoting Birtha v. Stonemore, N.C., LLC, 220 N.C. App. 286, 727 S.E.2d 1, 10 (N.C. Ct. App. 2012)).

Plaintiff makes claims based upon the alleged breach of contract as well as separate and apart from the alleged breach.

      1.     <u>Plaintiffs' NCUDTPA claim based upon the alleged breach of contract</u>

Plaintiffs argue that Defendant's conduct in breach of its contracts (the application of FX conversion rates exceeding the range of wholesale market rates observed on the relevant processing dates) violates the NCUDTPA because Defendant never intended to perform the promise it made at the time of contracting. An intentional misrepresentation made for the purpose of deceiving another and which has the natural tendency to injure another may be a substantially aggravating factor. <u>McManus v. GMRI, Inc.</u>, No. 3:12–CV–009–DCK, 2012 WL 2577420, at *5 (W.D.N.C. July 3, 2012); <u>Baldine v. Furniture Comfort Corp.</u>, 956 F. Supp. 580, 588 (M.D.N.C. 1996). But for a deliberate misrepresentation to constitute a substantial aggravating factor, it must have induced Plaintiffs to enter into the contracts. <u>Mapp v. Toyota World, Inc.</u>, 344 S.E.2d 297, 301 (N.C. Ct. App. 1986). In <u>Mapp</u>, the plaintiff showed "not just a breach of promise" but "a fraudulent scheme, *i.e.*, a contract **induced by the defendant's promise** to allow rescission of the contract by plaintiff, which promise defendant never intended to keep." <u>Id.</u> (emphasis added). Even accepting as true Plaintiffs' conclusory allegations regarding Defendant's intent regarding performance of its promises, the Complaint furnishes no additional facts showing these intentional misrepresentations induced any action by them. <u>Cf.</u> <u>Hageman v. Twin City Chrysler-Plymouth Inc.</u>, 681 F. Supp. 303, 307 n.4 (M.D.N.C. 1988) (holding that misrepresentations that did not induce contract formation were not substantially aggravating factors under the NCUDTPA).

To demonstrate substantially aggravating factors, Plaintiffs rely solely on a quote from <u>Gilbane Bldg. Co. v. Fed. Rsrv. Bank of Richmond, Charlotte Branch</u> that a "broken promise is

unfair or deceptive only if the promisor had no intent to perform when he made the promise." 80 F.3d 895, 903 (4th Cir. 1996). The Gilbane court essentially defined fraudulent inducement but still noted the requirement of a nexus between the intentional misrepresentation and plaintiff's damages. Plaintiffs do not allege they ever read the relevant Cardholder Agreements or that they would not have entered into a contractual relationship with Defendant or conducted foreign transactions with Defendant-issued cards but for the representations Defendant made regarding the FX conversion rates.

For these reasons, Plaintiffs do not state a claim under the NCUDTPA based upon the alleged breach of contract.

2. Plaintiffs' NCUDTPA claims separate and apart from the alleged breach of contract

Plaintiffs argue that Defendant's conduct "in using its power to charge powerless consumers inflated, arbitrary FX rates was itself *unfair*, separate and apart from any contractual representations or obligations." Doc. 344 at 19 (emphasis in original). The essence of this claim centers upon the selection of FX conversion rates, conduct which is governed by the contracts between Defendant and Plaintiffs. This is a breach of contract claim. See Suntrust Bank, 732 S.E.2d at 599. Any disproportionate market power on the part of Defendant does not separate its selection of FX conversion rates from its contractual promises, but rather contextualizes those selections within the contract. See Rezapour, 2013 WL 3326026, at *6 (holding the defendant's coercive leveraging of its bargaining power to hold plaintiffs' down payment and project hostage constituted a "substantially aggravating circumstance" surrounding the alleged breach of contract). Therefore, Plaintiffs cannot sustain a claim under the NCUDTPA separate and apart from their breach of contract claim.

For these reasons, the undersigned respectfully recommends Defendant's Motion to Dismiss be <u>granted</u> with respect to Count IV.

## VI. Defendant's Motion to Dismiss Count V Under the California Unfair Competition Law Should Be Granted.

The California Unfair Competition Law prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code 17200. The remedies provided by the UCL are equitable in nature. <u>Nationwide Biweekly Admin., Inc. v. Superior Court</u>, 462 P.3d 461, 464 (Cal. 2020). As a threshold matter, a plaintiff must establish they lack an adequate remedy at law before securing equitable remedies for past harm under the UCL. <u>Sonner v. Premier Nutrition Corp.</u>, 971 F.3d 834, 844 (9th Cir. 2020). There appears to be a split among courts in the Ninth Circuit as to whether it is appropriate to dismiss a UCL claim at the pleadings stage when it is premised on identical facts as other claims providing legal remedies. <u>Eason v. Roman Catholic Bishop of San Diego</u>, 414 F. Supp. 3d 1276, 1282 (S.D. Cal. 2019). Some courts decline to do so, citing the Ninth Circuit's "general rule . . . that plaintiffs may plead alternative claims, even if those claims are inconsistent." <u>Byton N.A. Co. v. Breitfeld</u>, 2020 WL 3802700, at *9 (C.D. Cal. Apr. 28, 2020) (citing <u>PAE Gov't Servs., Inc. v. MPRI, Inc.</u>, 514 F.3d 856, 858-59 (9th Cir. 2007)).

Plaintiffs urge this Court to allow them to plead their UCL claim in the alternative because Defendant "is challenging the enforceability of the contract as to FX rates." Doc. 34 at 21. But as discussed above, Defendant does not contest the existence and enforceability of the Agreements. Defendant expressly concedes the Agreements are valid and controlling, and disputes that those contracts contain the promises regarding application of FX conversion rates alleged by Plaintiffs. Because the existence of a contract and thus the legal remedy afforded by the contract is not in dispute, Plaintiffs' claim for equitable relief for past harms under the UCL should be dismissed.

Plaintiffs also argue this claim should survive because they seek different remedies (injunctive relief) than are available under their legal claim. The Complaint centers entirely on Defendant's past conduct which resulted in alleged monetary damages to Plaintiffs. It does not allege that Plaintiffs continue to use their cards or have any intention to do so in the future, or that Defendant continues to or imminently will charge inflated FX rates on Plaintiffs' foreign transactions. It includes one brief, perfunctory request for "any and all other relief that may be available, including future injunctive relief." Doc. 29, ¶ 150. The Complaint does not sufficiently lay out the basis for this tossed-off request for injunctive relief, and it is not enough to save Count V from dismissal.

For these reasons, the undersigned respectfully recommends Defendant's Motion to Dismiss be <u>granted</u> with respect to Count V.

## VII. Defendant's Motion to Dismiss Count VI Under the Texas Deceptive Trade Practices Act Should Be Denied.

To state a claim under the Texas DTPA, a plaintiff must show that "(1) plaintiff is a consumer; (2) defendant is a proper defendant under DTPA; (3) defendant committed a violation of the statute; and (4) the violation caused plaintiff damages." <u>Strickland v. Bank of New York Mellon</u>, 838 F. App'x 815, 818-19 (5th Cir. 2020). A "consumer" is one who (1) has sought or acquired goods or services by purchase or lease and (2) can show that the goods or services purchased or leased form the basis of the complaint. <u>Id.</u> at 819.

Defendant argues only that the Texas Plaintiff, McDonald, does not meet the statutory definition of "consumer" because she did not purchase a good or service from Defendant that was the "objective of the transaction." Doc. 31-1 at 24 (quoting <u>Strickland</u>, 838 F. App'x at 819); Doc. 36 at 21 (same). But "[t]he services provided by a bank in connection with a checking account are within the scope of the DTPA." <u>La Sara Grain Co. v. First Nat. Bank of Mercedes</u>, 673 S.W.2d

558, 564 (Tex. 1984). See also Plaza Nat. Bank v. Walker, 767 S.W.2d 276, 278 (Tex. Ct. App. 1989) (affirming and extending this principle to savings accounts). Although "a person who seeks solely credit, i.e., use of money, from a bank is not a 'consumer' under the DTPA[,]" Plaza Nat. Bank, 767 S.W.2d at 278, McDonald and other members of the putative class did not seek merely to use the funds they deposited with Defendant. The objective of their transactions with Defendant was to obtain Defendant's services in converting those funds to a foreign currency. The objective of their transactions generally was to obtain goods and services denominated in foreign currencies, to which the conversion services sought of and provided by Defendant were an "important objective," not merely "incidental." Canfield v. Bank One, Texas N.A., 51 S.W.3d 828, 838 (Tex. Ct. App. 2001). Therefore, Plaintiff McDonald and members of the putative Texas Class are "consumers" under the Texas DTPA.

For these reasons, the undersigned respectfully recommends Defendant's Motion to Dismiss should be denied with respect to Count VI.

## VIII. Defendant's Motion to Stay Should Be Denied.

"A court's power to stay proceedings is 'incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" Couick v. Actavis, Inc., No. 3:09–cv–210–RJC–DSC, 2011 WL 248008, at *1 (W.D.N.C. Jan. 25, 2011) (quoting Landis v. North American Co., 299 U.S. 248, 254 (1936). The party seeking a stay bears the burden of proving "hardship or inequity in being required to go forward" and that "clear and convincing circumstances outweigh[] potential harm" to the responding party. Williford v. Armstrong World Indus., Inc., 715 F.2d 124, 127 (4th Cir. 1983) (quoting Landis, 299 U.S. at 254).

Those circumstances are not present here. Defendant argues that absent a stay, it will suffer the hardship and inequity of being required to litigate this case in parallel to Plaintiffs' separate

litigation against Visa and Mastercard in other jurisdictions. But while a factual finding in those cases that Visa and Mastercard only applied FX conversion rates within the range of wholesale rates to Plaintiffs' transactions would settle their breach of contract claims, Defendant does not explain how producing that same evidence in this case would be so burdensome as to constitute a hardship or inequity. It has not carried its burden here.

For these reasons, the undersigned respectfully recommends Defendant's Motion to Stay be <u>denied.</u>

## RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that Defendant's Motion to Dismiss be <u>granted</u> in part and <u>denied</u> in part, that Defendant's Motion to Strike be <u>denied</u> as moot and its Motion to Stay be denied.

## NOTICE OF APPEAL RIGHTS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within fourteen days after service of same. Failure to file objections to this Memorandum with the District Court constitutes a waiver of the right to de novo review by the District Judge. <u>Diamond v. Colonial Life</u>, 416 F.3d 310, 315-16 (4th Cir. 2005); <u>Wells v. Shriners Hosp.</u>, 109 F.3d 198, 201 (4th Cir. 1997); <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1365 (4th Cir. 1989). Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. <u>Thomas v. Arn</u>, 474 U.S. 140, 147 (1985); <u>Diamond</u>, 416 F.3d at 316; <u>Page v. Lee</u>, 337 F.3d 411, 416 n.3 (4th Cir. 2003); <u>Wells</u>, 109 F.3d at 201; <u>Wright v. Collins</u>, 766 F.2d 841, 845-46 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to the parties' counsel and to the Honorable Robert J. Conrad, Jr.

**SO ORDERED AND RECOMMENDED**.

Signed: July 1, 2022

David S. Cayer
United States Magistrate Judge